of America are going to have to exceed 15 minutes per side. Mr. Goldsmith for the appellant. Good morning, your honors. On behalf of defendant appellant Jerome Rabinowitz, Aaron Goldsmith appearing, I would like to request two minutes for rebuttal. Fine. If it pleases the court, defendant appellant Jerome Rabinowitz should have his case reversed or remanded for a number of reasons as cited in the briefs. First and foremost, there was an error by the trial court in failing to grant the mistrial that was requested by defendant at the conclusion of the Remmer hearing. As the court has no doubt read in defendant appellant's briefs, there was a publication to the jury of materials that had been explicitly prohibited by a motion in limine and the decision in order provided by the trial court immediately preceding the commencement of the trial. The particular materials discussed the end use applications of the electronic parts at issue in the underlying trial. It was determined by the trial court in response to defendant's motion at the time that the information of the end use application would be significantly prejudicial and the prejudice therefrom would significantly outweigh any probative interest that the parties may have in attempting to administer that evidence. Was there a particular juror whose continued service particularly troubled you? There were multiple jurors whose continued service troubled me as counsel, your honor, and as the defendants. Not that I could particularly articulate one from the record. What was troubling, as I indicated in the briefs, is that the tenor of the hearing that the vast number of jurors discussed having been made aware by a smaller group of jurors as to having read the particular information that had been precluded. More particularly, they had essentially read these reports that indicated that the items were of use in very sensitive military applications, particularly one describing use in the USS Ronald Reagan nuclear submarine. You said they had read. I thought there was only one juror who had read it. There was one juror who had read it and discussed it with a smaller group of other jurors. The smaller group of other jurors had discussed the fact that she had read it and essentially, while the larger group of jurors as a whole had acknowledged that there was discussion that they could hear about nuclear and USS Ronald Reagan, there were certainly some jurors who said they had not heard anything and had not taken part in the conversation. Are you talking... It was really a circumstance where... Mr. Goldsmith. I'm sorry. Can you hear? When we speak, I wonder if you're able to hear that. This is Judge Cook. Yes, I can hear you now. All right. My question is, are you discussing juror 50? Juror number 50, we have the voir dire that took place with respect to that juror. That is the juror who testified to reading the material aloud. Yes. Juror number 50 is, in fact, the juror who had testified to reading the material aloud. She was subsequently removed by the court sui sponte. Taking your argument from there, I'm wondering if you can articulate, going particularly to the prejudice feature of this. You tell us that there was some knowledge about it being a nuclear vessel. Is that the prejudice or is it the name of the vessel, Ronald Reagan? I'm trying to get to the heart of the prejudicial feature of the error you claim. Given that some jurors were dismissed, the ones that I think you acknowledge had the most to say during the voir dire that may have led the court to dismiss them. Speak to the prejudice, if you would. Yes, Your Honor. The prejudice specifically is that several of the jurors during the hearing described or stated that they did not want to think about the application for fear of what the repercussions would be. That is the exact harm that was meant to be avoided by the court's initial decision in Luminae. When taken in context with the fact that the juror number 50 and the other small group of jurors who had discussed it more in depth than the group as a whole had discussed the fact that it was a nuclear powered aircraft carrier, is the prejudice at issue. Each of the jurors, as I understood it, when voir dired, each juror that was retained was asked whether or not they could be fair, the usual questions. And they answered in the affirmative. So, taking that at two into consideration, what is your best argument for saying that this nevertheless was a jury that couldn't be fairly sanctioned? That's essentially it, Your Honor. That the prejudice was of such a magnitude that even the court's attempts to rehabilitate the jurors and even the jurors' attempts to articulate their desire to be fair and impartial cannot overcome the overwhelming amount of prejudice caused by these particular circumstances. This is, in quite commonplace within the trial court perspective, the old adage of one cannot unring the bell. And that's what we have here. And the significance of the prejudice is self-evident because the trial court had deemed that the prejudice was so great that it was going to preclude the introduction of the evidence. So, the law of the case itself establishes the prejudice of being that beyond which a juror would be able to rehabilitate themselves from hearing and witnessing. Well, in terms, though, the jurors, this is Judge Gwynn, didn't the jurors hear all kinds of testimony that items your client had arguably misrepresented and that were military items? They had, Your Honor. I mean, was there any secret that they were all military items and was there any secret that they were on kind of a controlled list to ensure that they were from a legitimate source and a legitimate quality? Yes, Your Honor. I'm sorry. The jurors heard that all through the trial, didn't they? They did. However, the difference is, if I may, that the jury having heard that these were military applications, which the court was careful throughout the trial in light of its decision in limine to keep somewhat vague, and the fact that the jury had also heard the term critical application item regularly throughout the trial in reference to the contracts did not in any way vitiate the prejudice, because these were terms and discussions that were vague. They were nebulous, and I think by all parties quite calculated in the sense that they were not necessary in order for the government to prove its case, and they were kept in a simplistic form to avoid any potential prejudice that may result in regard to the end-use applications. I'm not sure what you just said, but are you acknowledging that the jurors already knew that these were all military parts that your client provided, and presumptively from the type of part involved, they would have known more generally what the use by the military was? I'm acknowledging that they knew that they were military. I do not believe that there would be any suggestion as to what the use was going to be for. As big as the Ronald Reagan aircraft carrier is, how do you get to the fact that there's prejudice if there's probably 10 million parts on the Ronald Reagan aircraft carrier? How do you get to prejudice just simply for the fact that some of the parts were going to be used on a ship that's a thousand feet long? Well, I think the court's point is what we had hoped was going to be the result in our conduct of trial. However, the articulation of the jurors during the... What does that mean? What it means is that we had tried to be vague in the descriptions and not articulating what the end use was under the order, and the government had not been discussing prior to the jury deliberations the details of these parts to avoid the prejudice of the jurors speculating as to what might happen if the part fails. Did the jurors... This is Judge Moore. Did the jurors know the identity of any of the parts? The parts were described as microprocessors and circuits. There may have been some discussion that it could be used in certain applications, but those were, again, quite vague and they were not specific as to use. Then how much is your client prejudiced from the fact that it's described as being on the Ronald Reagan? For the very essence that some of the jurors said that they did not want to think about what would happen if the parts failed. Did they say they didn't want to think about it or that they knew they shouldn't think about it? It was, as I recall, Your Honor, both. I would note just for the record that I believe my initial time is up. Fine. You can have your remaining time for rebuttal. Thank you. Ms. Young? Thank you, Your Honor. If it please the Court, Mary Beth Young on behalf of the United States. I'd like to begin by addressing a few of the points that were raised by Mr. Goldsmith. First, that last point under discussion regarding several jurors thinking or stating that they did not want to think about the consequences. If the Court reviews docket number 97, which is the transcript that includes that voir dire, only jurors 50 and 18 expressed specific concerns about or fears over what could happen in the event of malfunction. And, of course, those were the two jurors who were excused. So we don't think it fairly represents the record to suggest that there were several jurors who expressed that concern. Mr. Goldsmith also suggested that the judge's pretrial ruling that the end uses were excluded under Rule 403 as substantially prejudicial in some way was law of the case or required the Court to make a similar conclusion when addressing the mistrial motion. That is not an accurate description of the law. A pretrial ruling on a Rule 403 motion, first of all, is subject to change during the trial itself and is addressing a different question legally than the Court faces when it's addressed with a mistrial motion. As the Court has focused on, the question at the time of a mistrial motion is whether there is actual prejudice demonstrated. And this Court has been clear in cases like Walker and Cooper that the burden is on the defendant to show actual prejudice, not just a risk of prejudice. And those cases follow along the Supreme Court's decision in Smith v. Phillips, which stated that due process does not require a new trial every time a juror has been placed in a potentially compromising situation. That's exactly the point of having the hearing. And when the judge here conducted the hearing, he was very careful in asking each juror individually what they had seen, what they had heard, and in getting those jurors' assurances about whether they could follow the Court's instruction and disregard the information that they had seen or heard. The only jurors that the Court had any concerns with after that colloquy were jurors 50 and 18, and those jurors were replaced by alternates. In addition... This is Judge Moore. As I understand your opponent's oral argument, he's contending that there were some other jurors who said something to the effect that they didn't want to think about the end use because it was so troubling. I'm paraphrasing what I heard Mr. Goldsmith to say. Could you address that point? That was the point I tried to address at the outset, and I don't know what to say about it other than to suggest that the Court look at Docket 97 and look at that colloquy, and by my reading, the only jurors that express any concern of that sort are the two who were excused. Juror number 18, who is one of the ones who is excused, does express, I suppose, some concerns of that sort. Ultimately, juror 18... I'm sorry. But 18 was excused and 50 was excused, so apart from them, you're saying there was nobody who expressed that? Yes, ma'am. And indeed, the other jurors, the jurors who served, were really unequivocal in expressing that they could follow the Court's instruction, that they could disregard end use, and that they could serve impartially. And on that record, we... What did the jurors who served, what did they know about the use of the parts from the testimony that was not challenged? Right. The contract documents themselves, from the request for quotations to the contracts, said on their face, critical application item. And the definition of that term was also admitted. Now, that's another of Mr. Goldsmith's issues, but the definition of critical application item was admitted at trial and referred to... It's quoted in our brief. I'm not sure I have it right in front of me, but referred to the sensitive applications that these parts would be used for. In addition, these parts were, on the face of the contract documents, identified as qualified manufacturer list and qualified products list parts. There was testimony by Mr. Adams, in particular, that described what those lists meant and why they were established and the rigorous processes that manufacturers had to go through to get on the list, and that part of the reasons for that were that the parts may be used in things like weapons systems. So, the jury had heard these are critical application items. They knew they were on this special list and required rigorous testing at the manufacturer level to ensure reliability because the parts may be used for things like weapons systems. Now, no particular end use had been identified. That had been excluded by the pretrial order, but the United States would submit, this is a case about fraud in Defense Department contracts, and it should not have been as novel as appellant suggests to find out that, in fact, some of the parts were used on an aircraft carrier. And again, Judge Moore, the jury did know that they were microprocessors and circuits. Is that right? Yes, absolutely. So, even the documents themselves, the documents that went to the jury that had this one unredacted sentence, what these documents are is one- to two-page memoranda that describe the ways in which the parts are unacceptable. The bulk of these memos, I'm looking just as an example at Government Exhibit 9-83, which is at page ID 2355. In this part, memoranda, which is one of the unredacted documents in question, it begins by discussing how the specific material was supplied, the contract required, part number, so-and-so long number. This item is a QML part, meaning Qualified Manufacturer List, and the approved sources are QP Semiconductor and Rochester Electronics. It goes on to describe that the actual material received was submitted to the testing center, and what was actually provided was a Phillips semiconductor part with a date range from 1995 to 1997. Now, keep in mind, this is on a contract in 2008 or so. The document, this testing document, goes on to articulate that trace documents were provided from the contractor that indicated that what was being provided was a 2006 lot part, as opposed to the actual 1995 to 1997 part provided. The trace documents provided by the contractor also indicated that the part would be a QP semiconductor, as opposed to the actual Phillips semiconductor that was provided. In the midst of all this information is the one sentence which indicated end use, and in this memoranda, as in the others, it's one part of one sentence that just says something like this part was intended for use on, and then states the end use. And as the court noticed from the colloquy... Although it may only be one sentence, it was the sentence that the juror number 50 latched on to. Yes, and juror number 50 was excluded, and in the context of the overall information, we continue to think that even for juror number 50, this sentence, she may have latched on to it because she realized she had not seen it previously, more so than that it was particularly surprising in its own right. I would also note that the judge, when he made his ruling denying a mistrial, had the information that the jury had seen throughout the trial, so he recognizes what other evidence is there on each of those counts, and these documents were within eight four-inch binders of government evidence that was put on to demonstrate this fraud through documentary evidence on each contract, beginning with the request for quotation, through the quotation representing that that's the part that's going to be provided, trace documents representing that's the part that's going to be provided, and ending with testing documents showing indeed that was not the part that was provided. For several of the counts, there's also evidence of forgery and falsification by Mr. Rabinowitz of trace documents, further misrepresenting the source of the parts as well as a call, a recorded call, in which Mr. Rabinowitz tells a packaging agent who had inquired about whether some parts were surplus to just take them out of their old bag and put them in another and go ahead and submit them. So the jury had heard all this evidence. This is what the court has heard when it makes its ruling, and the district court was in the best position to understand having spoken with the jurors, having seen the evidence, whether actual prejudice had been established. And it's, am I correct, counsel, that this, at least in terms of the sidebar that took place with respect to critical, the definition of critical application parts were critical application parts, it's, the record shows that the court said, or counsel, I guess it's you, who said, hey, that term appears on all the, you know, many, many of the documents that are before the jury anyway. Critical application is no secret. Am I right? The term, the term critical application items appeared, I think, on all but, actually in every convicted count the term appeared. It was on every contract, in every contract other than counts two and four, and those were both acquitted. So there was never any question that the term was pervasive, also in witness testimony. The definition had been used by the prosecutor in his opening statement without objection. So, and was properly used because given the pervasiveness of the term it was only appropriate that the jury be given some information about what the term means that they're seeing in all these contract documents. And then there, then there was a witness who gave the definition, is that correct? And that is one of the things that your opponent objects to. Yes, there was a witness Kevin Goad, actually the same witness who authored the memoranda that are in question. He was a Defense Logistics Agency employee who was involved in the testing of the parts. The definition was given during his testimony and the objection, if any, was very unclear as to, it was not an objection to the definition, whether when the AUSA pointed out that this was the very same definition that had already been used in opening, the objection was to going beyond that. The definition is taken from the Defense Logistics Acquisition Directives. So, this is a publicly available document. Mr. Rabinowitz as someone who had been in the industry for many years was certainly aware of. Thank you. There is also... Do you have any... I think you have a short amount of time left. If you wish to say whatever you'd like to say. I just want to... As to the jinx issue, I just wanted to reiterate, as our brief states, that this issue is not properly before the court. There's a... It was not resolved by the district court for the reason that there was no suggestion that there was a violation that required a mistrial or a new trial. No factual resolution as to what jinx material were provided. And no objection during trial by the defense that there was any lack of jinx material. Thank you very much. Thank you. Mr. Goldsmith. Thank you. In rebuttal to what the government has said, I would first like to address the government's comments as to the record of the jurors' fears of the evidence that had been incidentally exposed to them. While it is my recollection that there were additional jurors that have voiced concern during the hearing, clearly the record will prevail and the panel has the record to review. My comments is to the law of the case. I clearly understand that it is that the evidentiary issues of any trial are changing on a day-to-day, witness-by-witness basis and that one ruling does not automatically force the trial court to abide by that same ruling and all other applications. But I discussed it in the sense that it does provide a guidance from the court as to what it will be examining and clearly in this particular case indicates that the court had been aware prior to the jury deliberation of the significant implications of the jury being exposed to this information. As to what... Is that a... I was just reading back through the district court's ruling on the motion in summary though wasn't the district court didn't it say that it was a close question but the government was going to already get in the critical application so that the end use on military wasn't of much addition to the government and there might be some prejudice so it granted your motion. I don't have the order in front of me your honor at this time but I would certainly say that my recollection was that not only was it in consideration of the other evidence being presented it was also in consideration of the prejudicial quality of the evidence. Now in terms of government... I hate to but your red light is on here which I'll just check with our clerk to make sure you've used up your time. The clerk is indicating yes. So I think at this point we will rely on the briefs for any further points and we appreciate both of you arguing on the telephone. I think we understand Mr. Goldsmith's situation from the motion that he filed and we hope that things work out well and this has been a very helpful oral argument and so we will issue a decision in due course and you can disconnect from the phone now. Thank you. Thank you. Thank you your honor. Certainly.